## Pilling et al. v. Moore et al.

*Joseph L. McAleer* and *John Arthur Brown*, for plaintiffs.
*C. Brewster Rhoads* and *Morris Wolf*, for defendants.

STERN, P. J., and GORDON, JR., J., April 21, 1931.—This is a bill in equity to restrain the erection and operation of an apartment-house garage, and the case is before us upon exceptions to the adjudication of the chancellor, who found that the district involved is a residential district of the second class, and entered a decree *nisi* restraining the construction and operation of the garage.

The controlling question raised by the exceptions involves primarily the classification of the residential district into which the neighborhood in question falls, in the light of the rules as laid down by the Supreme Court for classifying residential districts.

It would be an affectation of diligence to review and attempt to reconcile the many cases dealing with the subject of garages as nuisances in residential neighborhoods which preceded the case of Burke *v.* Hollinger, 296 Pa. 510. This labor has been thoroughly and authoritatively performed in that case by Mr. Justice Kephart. In it we find not only the first comprehensive analysis of the law of the subject as it has been developed by the decisions, but also a new and definite classification of residential districts, resulting in a profound and radical change in the law to adapt it to the demands of modern conditions. The controlling question before the court in the Hollinger case, as in the one before us, was the nature and character of the district in which the garage was to be built. In a district strictly residential in character, the law was well settled that a public garage was a nuisance *per se* and restrainable by injunction. On the other hand, if the district was not strictly residential, equity could not enjoin the presence of the garage, but its power was limited

solely to controlling its operation. In other words, in strictly residential districts, a public garage, like bone-boiling establishments and similar offensive occupations, has always been held to be a nuisance *per se* and prohibited; in all other neighborhoods, a garage is not a nuisance in itself, but may become so by its method of operation; and, hence, in such localities, the existence of the nuisance depends upon disputable questions of fact rather than an arbitrary and irrebuttable legal presumption. The decisions prior to the Hollinger case created uncertainty and confusion in the determination of when to apply the strict rule applicable to exclusively residential neighborhoods and tended to bring it into operation in sections where it worked hardships and injustice by ignoring the plain fact that no real or substantial nuisance existed or was threatened, and where the absence of such a public convenience rendered the locality less valuable and desirable for either residential or business purposes. By dividing strictly residential districts, however, into three classes and withholding the nuisance *per se* rule from the third class, the rigors and injustice of the obviously false legal presumption that a public garage could not be conducted without being a nuisance in fact were mitigated and the law was modernized to square with the facts and with the just demands of our metropolitan civilization. In the first two classes of residential districts, the old rule remains. In the third, however, the right to an injunction depends, not upon the presence of the garage, but upon the manner in which it is conducted. This advance in the law of the subject, however, shifts the perplexing question as to whether an injunction should be granted from one largely of law to one of fact, namely, into which class the particular district under consideration falls. In laying down the new rules, Mr. Justice Kephart, after discussing the preceding decisions, said: "We have never attempted to state what an exclusively or predominantly residential district should consist of, nor can it be accurately done. What is here suggested is the types of uses that may constitute a given district. In certain aspects these may control and by the uses stated not only may the application of the rule above announced in our decided cases be properly gauged but some idea may be given for future action.

"A district composed of one-family dwellings, churches, library, with an occasional grocery store, doctors' and lawyers' offices in homes, would unquestionably compose an exclusively residential district; and such accessory uses as private garages, stables and necessary outbuildings for the comfort or enjoyment of the premises, would not affect its exclusive character. A second type of residential district, closely resembling the one referred to, but not so exclusive, is one having in addition to the above uses the following: double houses, schools, public or private garden, with their accessory uses. In each of the foregoing classes our previously established rule as to public garages unquestionably applies.

"A third type or class of residential districts combines the above, also houses used for tenements, flats, apartments of any character, hotels, boarding houses, fraternities, clubs, hospitals and the like. All of the above classes are predominantly residential, some more exclusively so than others, but, in the class last mentioned, it is apparent some buildings assume a commercial aspect."

The garage under consideration in the Hollinger case was on Latimer Street, a small street north of Spruce, between Fifteenth and Sixteenth Streets, in the City of Philadelphia, and the court held that that district fell within the last of the three residential district classes enumerated, and per-

mitted the garage to be operated, subject to certain regulations to be laid down by the court below.

Two months after the decision in the Hollinger case formulated the rules to be followed in garage cases, the Supreme Court, in an opinion filed by the same justice, in the case of Ladner *v.* Siegel, 296 Pa. 579, elaborated and clarified the rules it had just announced. The defendants in that case had contemplated the erection of a garage on land situated between Forty-seventh, Forty-eighth, Spruce and Pine Streets, in the City of Philadelphia. The garage was to accommodate 429 cars, and units of apartment houses were to be erected surrounding it. The Ladner case had been before the court prior to the decision in the Hollinger case, and had resulted in the issuance of a permanent injunction restraining the operation of the garage as being in a strictly residential neighborhood. Subsequently, the defendants completed some of the apartment units and leased a part of the garage to tenants of the Garden Court Apartments, which the defendants also owned, and which was located directly across the street from the operation which was restrained. The complainants then brought the defendants before the lower court, which adjudged them in contempt for violating the injunction decree. After an appeal to the Superior Court, which reversed the court below, the complainants then appealed to the Supreme Court. That court reversed the Superior Court and upheld the decision of the lower court adjudging the defendants in contempt. This they undoubtedly were, for they had clearly violated the sweeping injunction issued against them. The value of the Supreme Court's opinion, however, lies in the fact that it advanced another step in harmonizing the law to modern conditions and requirements, and opened the way for a modification of the strict injunction previously issued in the case, by holding that the neighborhood was a third-class residential district, and authorizing a modification and liberalization of the decree previously entered. Without going into all of the facts of the case, it may be pointed out that among the considerations controlling the determination of the class into which the district fell, the Supreme Court emphasized that: "More people in the neighborhood live in apartment houses than in private residences; there are no stores or business places except a drug store, restaurant, commercial swimming pool and the Garden Court Apartment; so much of the neighborhood as is built up is residential in character, the tendency being toward apartment house sections rather than individual residences."

Further on in the opinion, the Hollinger case was referred to as one "where a distinction was made as to regions bordering on a commercial district in conjunction with the elimination of many of these distracting and destructive features [the noises, odors, etc., supposed to accompany the operation of a garage] by present day operation." The fact that in the Hollinger case the court seemed to lay stress upon the consideration that the locality "bordered on a commercial district" did not make that feature the exclusive test of a third-class district, for in the Ladner case it was held to be of that class, although the district did not border on a commercial district.

The court then gave utterance to a significant and illuminating line of thought. Referring to the leasing of a part of the garage for the use of tenants of the Garden Court Apartments across the street, Justice Kephart said: "They [the defendants] say that this apartment is owned by them and they should be permitted to use the present garage in conjunction therewith. We have indicated that under the decree of the court below this use could not be done. We did not decide as to the apartment units nor was any opinion expressed thereon, but we are all of one mind that the building for such use

protected by adjoining apartments was clearly proper and could be used by its tenants. The use by others in a residential district was in violation of the decree." Here would seem to be a recognition of the right of owners of apartment houses, by virtue of their ownership, to maintain garages on the premises for the use of themselves and their tenants. The reasoning which it suggests and the line of thought to which it gives rise, however, will be considered later in this opinion.

It is evident from the court's reasoning up to this point in the Ladner case that the district then under consideration was a third-class district, and, hence, that the original decree, which was applicable only to first and second-class districts, worked a wrong to the defendants in that case. Therefore, after dealing with another less important phase of the case, the court said: "We now find it necessary to enlarge our policy relating to the use of buildings in third-class districts. The reasons for this have been pointed out in Burke v. Hollinger. One of the chief auguries of the continued success of business, industrial and educational enterprises of cities, is a convenient and adequate system of quick communication or transportation to and from these centers. It is not a matter of purely individual concern but of public interest. A policy which continues to shut out all accommodation for automobiles in residential sections such as this one must necessarily inconvenience the traffic. It must seriously challenge judicial attention, as such districts are thickly inhabited centers." After some further discussion the opinion continues: "Our conclusion from these considerations is that in third-class residential districts a garage properly built to, under or around an apartment house is not a nuisance per se. Its use, however, from the fact of operation may become a nuisance. In such districts the method of construction and operation should conform to that laid down in the Hollinger case; and where two apartments in the same vicinity are joined in the same ownership, a garage under one building or built as in the instant case may serve both. As operation becomes the decisive factor, we suggest that the manner in which the place is conducted, particularly as it refers to the properties on Pine and 46th streets, should receive careful attention. . . . Whether other owners in this immediate vicinity may use the garage in question will be left to the sound discretion of the court below." The court then concluded by sending the case back to the lower court with instructions that "When appellees have purged themselves of the contempt order, leave is then granted to appear before the court below and by petition ask for a modification of the decree in the light of the concluding part of this opinion."

The short dissenting opinion of Mr. Justice Schaffer in the Ladner case emphasizes the extent to which the Supreme Court has gone in liberalizing the judicial attitude toward garages. That justice said: "I would confine the use of the garage to the occupiers of the apartment house as a part of which it is constructed and not permit the use of it by any others." There is much logical force in the contention that all owners or occupiers of land, whether they be one or many persons, should be entitled, by virtue of their ownership and occupancy, to use their land as they please, even to the keeping of automobiles upon it in an adequate garage, provided the use to which it is put does not injure a neighboring owner. The Supreme Court has definitely held, however, that there is no distinction to be drawn in law between a public and a private garage, when the latter is used for the accommodation of many cars, whether they be owned by one or by a number of common tenants of the land: Ladner v. Siegel, supra, at page 587. Nevertheless, in the Ladner case, the court suggested that the use of the garage in question

be permitted, not only by the tenants of the apartment to which it was built as an adjunct, but also by the tenants of the apartment across the street, and even in the discretion of the court below by "other owners in the immediate vicinity." This suggestion was followed after the case was returned to the court below, which modified its original decree by permitting the defendant to use the garage "for the storage of automobiles by the tenants of Garden Court Apartments, . . . or by the tenants of the apartment houses now being erected, . . . or by any other apartment house erected in the block" in question, and this modified decree was affirmed by the Supreme Court in the case of Ladner *v.* Siegel (No. 4), 298 Pa. 487.

From these decisions we gather certain definite principles to guide us in the classification of residential districts and the application of the law to the different classes. First- and second-class residential districts are characterized by the presence of separate one-family and double (twin) dwellings exclusively, with their usual accompanying local conveniences, such as churches, libraries, local stores, professional offices in homes, schools, private gardens, etc. As to these two classes, the nuisance *per se* rule, with its accompanying absolute prohibition of large or commercial garages, must be applied. Third-class residential districts comprise all other predominantly residential sections, and their distinguishing criterion lies in the fact that they combine first- and second-class dwellings with other less exclusive forms of residence, such as tenements, flats, apartments, clubs, hospitals and the like, and may be found existing independently or on the borders of first- and second-class districts or of business and commercial localities. As to this class of residential district, a garage cannot be prohibited as a nuisance *per se*, but its operation may be carefully and strictly supervised and controlled.

A consideration of these classifications immediately suggests that the reason for the distinction between the first two and the third class probably lies in the presence in the latter of a greater number of persons living in close proximity to each other, with the concentration in a narrow area of the bustle and activity of a crowded residential life. Such activity does not differ fundamentally from that of the higher class residential district, but its greater volume would tend to detract from the essentially quiet and reserved life which is the chief attraction and distinguishing characteristic of first- and second-class districts. Accordingly, charitable institutions, such as homes for the aged, hospitals and the like, which bring many persons together in one place, would also be found in third-class districts. These considerations give the clue to the reason for the adoption of the broader and more tolerant rule as to garages in districts of this class. The very presence of so many persons with their multiplied activities justifies and requires the rule. To arbitrarily deprive the residents of an apartment house, merely because they are numerous, of the right to maintain their own cars on the same ground on which they live would work an invidious distinction between them and the individual house owner, which equity cannot countenance. This is especially true in view of the clear teaching of experience that the modern garage can be, and is, operated without actual annoyance to neighbors. The antiquated and erroneous notion that a garage is inseparable from substantial nuisance must give way to the truth, at least after a neighborhood has become so populous that to restrain so necessary a convenience would inflict unreasonable hardship and injury upon a large part of the community in order merely to preserve for a few a theoretical immunity from an annoyance which is largely, if not altogether, imaginary. The supersensitiveness of the few should give way to the social well-being and happiness of the many.

The learned chancellor placed the district here under consideration in the second class and applied the doctrine of nuisance *per se* to the garage in question. This leads us to a consideration of the correctness of this finding. If his conclusion is right that this is an exclusively residential neighborhood of the second class, the decree which he entered necessarily follows. If, however, it is a third-class neighborhood, the control which the court is given over garages in such districts should be exercised but the garage permitted to operate.

We have carefully considered the evidence upon this subject, together with a view of the locality, and are forced to the conclusion that this is a third-class and not a second-class residential district. Taking the square in which the apartment house is located and considering the areas involved, we find that considerably more than half of the total area is used and occupied by institutional homes and apartment houses. The Home for Musicians, the Baptist Home and one small and three large apartment houses cover well over a half of the entire square. Across Greene Street from this square is a church and school; also the tracks and station of the Pennsylvania Railroad; and generally in the bigger area, which may be designated as the vicinage, large and luxurious apartment houses dot the map submitted to us. This section is not exclusively composed of those one-family detached dwellings which are the test of the first-class district; neither is it characterized by the added presence only of double or twin homes, which would bring it within the second class.

It is true that, as to two of the other three apartment houses in this square, proposed garages for the accommodation of the occupants were heretofore restrained by Court of Common Pleas No. 4 upon the ground that the district was exclusively residential in character. It is not necessary either to analyze or to endeavor to distinguish the decisions in those cases from the case before us. An exclusively residential district of the first or second class is changed into a third-class district by the very process which gave rise to the successive decisions in the previous cases referred to. The multiplication of apartment houses itself changes a neighborhood. When the point arrives at which a neighborhood can fairly be said to have changed from one class to another is always difficult of determination during that period of the transition when it is neither the one nor the other. There comes a time, however, when it can be confidently asserted that the change has occurred and that the district is at last undoubtedly of the third class. That time, in our judgment, has been reached in the case before us, and the owners of land in the district are entitled to claim all the rights of third-class district residents. We cannot, therefore, agree with the conclusion of the learned chancellor that this is a residential district of the second class.

As to the operation of the garage itself, we think the evidence sustains the conclusion that it is so constructed that it is capable of being operated without becoming a nuisance in fact; and there is nothing to indicate that there is danger of its being operated otherwise. Indeed, the chancellor seems to have been much of the same mind, for in his adjudication he said: "In reviewing the testimony, we are not entirely convinced that the garage as constructed at the rear of defendants' lot would, if properly operated, necessarily constitute a nuisance. It is highly probable that parking of the tenants' cars on the lawn between the front of Upsal Gardens and Upsal Street might prove more unpleasant to the owners of Upsal Street residences than the housing of the cars in the proposed garage." The contour of the ground on which the garage has been built rises so sharply from the rear of the apart-

ment house that the garage is practically an underground structure. It is noise-proof—at least as much so as modern construction can make it—and undoubtedly can be operated without annoyance to others.

One other thought may not be irrelevant to the question under consideration. The modern high-class apartment, such as this is intended to be, requires garage facilities of the proper kind in order to reach its highest efficiency and desirability, and any enforced reduction of such conveniences only depreciates the value of the apartment, with a consequent diminution of its market value, which is necessarily reflected in the resultant character and value of its neighborhood. To enjoin this garage, therefore, would have the effect of depreciating the neighborhood rather than of maintaining it at the highest possible standard among neighborhoods of its class. Restraining the operation of the garage will do more injury than good to the plaintiffs, for it will of necessity aggravate the local traffic conditions. Without a place to house their cars, the occupants of the apartments will probably park them during most of the day, and even at night, on the street in front of the apartments and before the homes of the plaintiffs, and thus the entire section will be more subject to annoyance than if the garage were allowed to operate under proper regulations. The real complaint of the plaintiffs is to the apartment house itself and not to the garage; and to the former they can have no legal objection. As long as the apartment is there, it is to the best interest of the plaintiffs that the garage operate, and in this view of the matter the bill would seem to be a menace to the future development of the section, for its success would work a real and irreparable injury to the entire locality.

Exceptions numbers four, five, seven and eight are sustained, and the bill is dismissed without prejudice to the plaintiffs to reopen the proceedings if the future operation of the garage becomes in fact a nuisance.

LEWIS, J., dissents.